CARRERA INTERNATIONAL CORPORATION, Plaintiff,

v.

CARRERA JEANS LTD. and Haim Ofier, Defendants.

No. 79 Civ. 6277–CSH.

United States District Court, S. D. New York.

Dec. 17, 1979.

MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiff Carrera International Corporation ("CI"), a New Jersey corporation, and its predecessors in interest have since 1960 manufactured and sold certain articles under the trademark CARRERA. In August, 1968 CI's predecessors registered the trademark CARRERA for ski goggles and sun glasses. In September, 1977 they registered the trademark CARRERA, in a distinctive logotype, for ski socks.

Defendant Carrera Jeans, Ltd. ("CJ") was incorporated in New York on June 6, 1979. Defendant Haim Ofier is its president. CJ manufactures and sells women's jeans bearing the label CARRERA. In September, 1979 CJ applied to the Patent and Trademark Office to register the mark CARRERA to be used in conjunction with the sale of jeans. That application is presently pending.

In August, 1979 a CI salesman observed CJ jeans being sold in Miami, Florida under the CARRERA label. This led to CI's demand that CJ cease infringement of CI's registered trademarks. CJ made certain modifications in its labels, stationery and business cards. These steps did not appease CI, which by complaint dated November 20, 1979 commenced this action, alleging trademark infringement, 15 U.S.C. § 1114,[1] false designation of origin, 15 U.S.C. § 1125(a),[2] and, in pendent claims, common law unfair

Windels, Marx, Davies & Ives, New York City, for plaintiff; Raymond T. Munsell, New York City, Fitch, Even & Tabin, Chicago, Ill., of counsel.

Bertram Frank, P. C., New York City, for defendants; Bertram Frank, Jeffrey M. Greenman, New York City, of counsel.

1. 15 U.S.C. § 1114 provides in pertinent part:
 "(1) Any person who shall, without the consent of the registrant—
 "(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or
 "(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements, intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.
 "shall be liable in a civil action by the registrant for the remedies hereinafter provided. . . . ."

2. 15 U.S.C. § 1125(a) provides:
 "Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation

competition[3] and violation of § 368–d of the General Business Law of New York.[4] CI seeks declarations of its own trademarks' validity and exclusivity, and of CJ's infringement thereof; an injunction preventing CJ from making further use of the word or name CARRERA, and directing CJ to remove the name from all its goods, stationery, advertising and promotional material; recovery of damages; and other relief.

The case is now before the Court on CI's motion for a preliminary injunction, and CJ's cross-motion to compel discovery in advance of a definitive hearing on the preliminary injunction motion. The parties have submitted affidavits and memoranda, and the Court has heard oral argument.

For the reasons stated, CI's motion for a preliminary injunction is denied on the present record, without prejudice to renewal at a later time; and CJ's motion to compel discovery is granted.

## I.

■ In *Caulfield v. Board of Education of the City of New York*, 583 F.2d 605, 610 (2d Cir. 1978), the Second Circuit said:

"This court has recently clarified the standard for issuance of a preliminary injunction: there must be a showing of possible irreparable injury *and* either (1) probable success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Selchow & Righter Co. v. McGraw-Hill Book Co.*, No. 77–7569, slip op. at 3533, 3537, 580 F.2d 25 at 27 (2d Cir. 1978); *Triebwasser & Katz v. American Telephone & Telegraph Co.*, 535 F.2d 1356, 1358 (2d Cir. 1976); *see* Mulligan, *Foreword—Preliminary Injunction in the Second Circuit*, 43 Brooklyn L.Rev. 831, 832–33 (1977)." (emphasis in original).

The *Selchow & Righter Co.* case, cited in *Caulfield*, was one for trademark infringement; hence the *Caulfield* formula may be taken as applicable to the case at bar.

CI says that it satisfies the standard on the basis of the affidavits and exhibits, so that a preliminary injunction should issue without further delay. CJ's response, in essence, is that relevant issues of fact require further development.

■ While there is precedent for the issuance of a preliminary injunction in trademark cases upon affidavits and pleadings alone, *Safeway Stores, Inc. v. Safeway Properties, Inc.*, 307 F.2d 495, 500 (2d Cir. 1962), the Second Circuit has also repeatedly cautioned against issuing preliminary restraints solely on the basis of affidavits where relevant factual issues exist. *Semmes Motors, Inc. v. Ford Motor Company*, 429 F.2d 1197, 1204 (2d Cir. 1970) and cases cited. Of course, where the defendant willingly joins in a battle of affidavits and requests no further factual development, it cannot later complain that the injunction was based on an inadequate record, *Semmes*, at 1205; *Jacobson & Co., Inc. v. Armstrong Cork Co.*, 548 F.2d 438, 442 (2d Cir. 1977); but here CJ makes timely assertion that the affidavits are insufficient.

---

of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation."

3. 28 U.S.C. § 1338(b) provides in part:
"The district courts shall have original jurisdiction of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the . . . trade-mark laws."

4. That statute provides:
"Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services."

We must therefore consider what the relevant issues are, and what the affidavits and exhibits say (or do not say) about them. The central issue was summarized in *Mushroom Makers, Inc. v. R. G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir. 1978):

> "It is well settled that the crucial issue in an action for trademark infringement or unfair competition is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question."

The Court, in making that determination, does not look "merely to the age of the competing trademarks," *Mushroom Makers* at 47; nor is similarity of the trademarks "in and of itself . . . the acid test. Whether the similarity is likely to provoke confusion is the crucial question." *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1133 (2d Cir. 1979), quoting 3 R. Callman, The Law of Unfair Competition, Trademarks and Monopolies, § 82.1(a) at 601–02 (3d ed. 1969). "In assessing the likelihood of such confusion," the *McGregor* court said at 1130, "we consider the factors laid out in the now classic *Polaroid* formula." The reference is to *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir. 1961), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961), where the Second Circuit said:

> "Where the products are different, the prior owner's chance of success is a function of many variables: the strength of his mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers. Even this extensive catalogue does not exhaust the possibilities—the court may have to take still other variables into account."

I must therefore determine, on the present motions, whether a record limited to pleadings and affidavits casts sufficient light upon these pertinent factors to satisfy the standard, summarized in *Caulfield*, for issuance of a preliminary injunction. The affidavits and exhibits will now be further considered.

## II.

The affidavit of Donald H. Saller, CI's general manager, verified November 27, 1979, recites the registration of the company's trademarks, and the use since 1960 of the CARRERA name on "sporting goggles and sunglasses for skiing, biking, and other athletic uses" sold throughout the United States. In 1976 the distinctive CARRERA logotype was adopted, "which was used on ski socks, as well as sports goggles and sunglasses." ¶ 4. The Saller affidavit contains, as Ex. A, a photograph of the CARRERA logotype on a pair of sports goggles. In "recent years," the affidavit continues, CI has broadened the goods sold under its two marks "to include products in the clothing area, such as shirts, gloves, and after-ski boots." ¶ 5. A photograph of a T-shirt bearing the CARRERA logotype appears as Ex. C. "In the last five years," CI and its predecessors in interest "have spent over $450,000 in the United States" in advertising its trademarked goods, and have sold "well over five million dollars worth of goods in the United States" under its marks. ¶¶ 6, 7. Mr. Saller avers that "the sport goggles, sunglasses, and other goods sold under the CARRERA marks have achieved a very favorable reputation among consumers, and especially among skiers"; thus CI has "been named the exclusive supplier of sunglasses of the U. S. Olympic ski team" in the upcoming 1980 games. ¶ 8. Mr. Saller states his opinion, "based upon his four years of experience" in directing CI's marketing activities, "that consumers and those in the trade are likely to be confused into believing that the jeans sold under the mark CARRERA and Design are in some way connected with Carrera International." ¶ 12. By "the mark CARRERA and Design," Mr. Saller refers to the distinctive logotype which CI registered in 1977.

In a supplemental affidavit verified December 10, 1979, Saller states that the goods bearing CI's trademarks "are sold to ski shops, sporting goods stores and department stores throughout the United States . . . ." The affidavit then lists eight shops which are located in the State of New York. Judging by the names of these shops, two specialize in motorcycles (Port Chester Motorcycles of Port Chester, and Robinson & Rochester Cycle of Rochester); two are optical equipment shops (Robert Optical Co. of Snyder and Thomas Turtle Optical of North Tonawanda); three shops specialize in sporting equipment (Sundance Sports Ltd. of Hyde Park, Bromleys Ski Shop of Goshen, and American Sports Products of White Plains); the eighth shop is identified as "Alexanders, Inc." It would appear, however, that this is not the large department store which confronts Bloomingdale's in close commercial rivalry on Lexington Avenue in mid-Manhattan; the address given for "Alexanders, Inc." in Mr. Saller's affidavit is 31 West 34th Street. The current New York telephone book lists an "Alexanders Department Store" at that address, but it would appear, from an advertisement running in the New York Times of December 13, 1979, at p. A8, that this is not a branch of the Alexander's whose main store occupies a full block on Lexington Avenue. The advertisement in question identifies the Alexander's branches as being located at Fordham Road, the Bronx; Flushing; Kings Plaza; Queens Boulevard; Roosevelt Field; Valley Stream; Yonkers; White Plains; Peekskill; Paramus; Menlo Park; Eatontown; and Milford, Connecticut.

The opposing factual affidavit (I place to one side, in this context, the affidavits of counsel, which are essentially argumentative) is that of Mr. Ofier, the president of CJ. Mr. Ofier recites the incorporation of CJ in June of 1979. He avers that prior to his involvement in organizing the defendant corporation, he was employed by the firm of Ferrari Jeans Inc., a New York company, engaged in the manufacturing and styling of women's jeans. Ofier states that, in selecting the name Carrera as a corporate name, and as a trademark for the corpora-

tion's jeans, he was influenced by the use of the term Carrera on a sportscar manufactured by Porsche. "I felt," Ofier states in his affidavit, "that using this term would lend to the defendant's women's jeans a similar flair that the mark Ferrari had lent to my previous employer's product." ¶ 3. Ofier acknowledges that he was aware of the term Carrera, used in association with ski goggles; but he denies knowledge of who was using that label. He states that "the use of the term Carrera by Porsche on their automobiles and the use of the term Carrera on ski goggles led me to believe that there would be no harm in my using the term Carrera in a corporate name and as a trademark for women's jeans." ¶ 5. Ofier states in his affidavit that, in June of 1979, the corporate defendant began the manufacturing and sale of women's jeans bearing the Carrera trademark. His affidavit continues: "Since then, the defendant's women's jeans have been sold to women's specialty clothing shops and clothing boutiques primarily in the New York metropolitan area and in Florida." ¶ 6.

On the question of injury, the Saller affidavit of November 27, 1979 avers that if CJ is not enjoined from conducting business under the name Carrera, and selling women's jeans under the trademark Carrera and the distinctive logotype, "Carrera International will suffer enormous injury to the goodwill which has been built up by Carrera International and its predecessors in the registered trademarks CARRERA and CARRERA and Design." ¶ 15. Ofier, on behalf of CJ, avers that the effect of such an injunction upon CJ would be "devastating," since it would force defendant to stop shipment of all garments for a period of at least six weeks, as there is no market for garments without identifying labels. ¶ 7. This deprivation, the Ofier affidavit recites, would bring about a disastrous interruption in the company's cash flow; and would also adversely affect the corporate defendant's reputation in the business community. ¶ 9.

## III.

From the affidavits and the exhibits attached thereto, certain preliminary observations may be made.

The first observation is that the Carrera logotype originally employed by CJ on its jeans—an example of which first came to the horrified attention of a CI salesman in Miami in August—is identical to CI's registered CARRERA logotype. A photograph of the label affixed to the jeans in question appears as Ex. E to the initial Saller affidavit. The copying is unmistakable. In the registered trademark, the initial letters "C" and "A", and the final letter "A", stand vertically; the middle letters, "RRER", are slanted to the right. That is also true of the original CJ jeans label. CI's registered trademark joins all letters together, at their base, except for a space between the base of the "E" and the base of the third "R". That is equally true of the original CJ jeans label. The letters themselves present a closely similar, stitched appearance. The closeness of these similarities excludes, in my judgment, an explanation of innocent coincidence. That conclusion is not altered by the fact that the jeans label contains a white star, a stripe, and a circled "R" which does not appear on CI's logo. The star and the stripe are incidental, and do not detract from the manifest copying of the logotype; as for the circled "R", counsel for CJ conceded on the argument that this was a bogus manifestation of trademark registration to which CJ was not entitled in law.

Thus, to the extent that under *Polaroid, supra,* the alleged infringer's good faith is a relevant factor, CJ is not in an enviable position in respect of its initial trademark.

■ Secondly, the affixation of the term "Carrera" to CI's ski goggles, sunglasses, and ski socks is arbitrary and fanciful. This militates in favor of the strength of the trademark, and its consequent entitlement to protection.[5]

These factors would appear to argue in favor of a preliminary injunction, on the basis of the papers presently before the Court. However, additional factors must be considered.

First, it is apparent from the affidavits that, in response to CI's initial protest in September, CJ made certain modifications in the label affixed to its jeans, as well as its corporate stationery and business cards. Examples of these modified manifestations are attached as exhibits to the Ofier affidavit of December 5, 1979, in support of CJ's cross-motion for discovery. While CI, at the argument, belittled the significance of these modifications, they are not entirely without effect; thus the letters are all vertically erect (none of them slant), and each letter is separated from the other at its base, at least on the labels attached to the jeans. (Some of the letters on the business stationery tend to run together at the base.) CJ characterizes these modifications as a good faith effort to cure any infringement problem; CI regards the modifications from a considerably less charitable perspective. Without attempting, on this record, a final resolution of that particular issue, I am bound to say that there is some substance to CJ's September modifications; and it is the labeling of the defendant's jeans in its present form, and not the form which initially aroused the wrath of the plaintiff, which must be considered in determining whether or not injunctive relief is appropriate.

It is against this background that I must determine whether CI has made a sufficient showing, upon the affidavits alone, to obtain a preliminary injunction. I answer that question in the negative, although I am mindful of the inherent strengths of CI's position. But in the last analysis, I am persuaded that a more detailed record must be made.

In *Avon Shoe Co. v. David Crystal, Inc.,* 279 F.2d 607 (2d Cir. 1960), the plaintiff was the exclusive owner of the trademarks "Haymaker" and "Haymakers," registered for gloves and shoes. Defendants, under the name "Haymaker," manufactured and sold items of feminine apparel, such as blouses, shirts, skirts, shorts and suits.

---

5. For the Second Circuit's most recent detailed analysis of the four classifications of trademarks according to strength ("generic," "de-

scriptive," "suggestive" and "arbitrary or fanciful"), see *Abercrombie & Fitch Co. v. Hunting World,* 537 F.2d 4, 9 (2d Cir. 1976).

Plaintiff sued defendants for infringement. This Court, after a lengthy trial before Judge Herlands, rejected the claim, and the Second Circuit affirmed. Of greater significance to the instant motions, however, is Judge Murphy's opinion for this Court, denying the plaintiff's application for a preliminary injunction. 117 F.Supp. 548 (S.D. N.Y.1953). Judge Murphy found that the application of the name "Haymaker" to such goods was arbitrary and fanciful; and (in response to plaintiff's proof that the sale of merchandise of both parties in the same shops occurred) "the circumstance of identical marketing channels and common purchasers for women's shoes on the one hand, and their blouses and skirts, on the other, is a factor conducive to likelihood of confusion in this case, and significantly favorable to judicial protection." 117 F.Supp. at 550.

"These are factors," Judge Murphy went on to observe, "which should weigh heavily in an ordinary proceeding for injunctive relief." However, he continued:

"But in an extraordinary one, such as the instant application for a preliminary injunction before trial of issues of fact, such factors may often be insufficient. A number of conflicting inferences remain unresolved after perusal of the 'evidence' —limited as it is to affidavits in this case."

Such factors included "respective commencement of use and volume of use, as well as defendants' overwhelming good faith or the total lack of it, depending on the affidavit in hand." *Ibid.* In these circumstances, Judge Murphy denied a preliminary injunction.

■ I find this reasoning persuasive in the context of the case at bar. CJ's jeans do not, by their nature, compete directly with any of the goods presently marketed by CI. That, of course, does not foreclose a finding of impermissible confusion as to source of origin. Cases enjoining non-competing goods from using an infringing mark are legion. Earlier decisions are collected by Judge Murphy in *Avon Shoe, supra,* at 549 n. 7; more recent authority is reviewed in *McGregor-Doniger, supra,* the Second

Circuit's latest decision on the issue of "when a trademark owner will be protected against the use of its mark, or one very similar, on products other than those to which the owner has applied it." 599 F.2d at 1130. The several pertinent factors are analyzed in detail by the *McGregor-Doniger* court, in the course of its opinion affirming Judge Lasker's ruling, after trial, that plaintiff manufacturer of golf jackets sold under the registered trademark DRIZZLER had not proved a likelihood of confusion arising out of defendant's sale of women's coats under the unregistered trademark DRIZZLE.

I shall not here reiterate the *McGregor-Doniger* factors, which were earlier summarized in *Polaroid, supra.* It is sufficient, for the purpose of the present motions, to observe that these factors give rise, in the circumstances of the case at bar, to a legitimate need for further factual development. Marketing factors such as, in Judge Murphy's phrase in *Avon Shoe,* "respective commencement of use and volume of use" are significant, as are the types of stores at which CI's products and CJ's jeans are sold. By way of illustrating the questions that arise, the cycle and optical stores that CI lists among its New York outlets presumably sell CI sports goggles and sunglasses, rather than articles of clothing, such as CI's ski socks and T-shirts or CJ's jeans. It would follow that in such shops the likelihood of confusion is substantially reduced. This is a significant factor; thus in *Hills Bros. Coffee Inc. v. Hills Supermarkets, Inc.,* 428 F.2d 379 (2d Cir. 1970), upon which CI relies, the goods in question were coffee and coffee-related products, and the Court of Appeals, directing a preliminary injunction, observed that "the two types of coffee will be located in the same area, often next to each other on the shelves at HSI stores, and the word Hills is so prominent a part of each, reasonably careful shoppers may well confuse the two." *Id.* at 381. To the extent that CI markets items of apparel, a greater potential for confusion exists; but the affidavits at least permit the inference that CJ's jeans are sold in kinds of stores which are quite different from those stores

selling CI products. This is an issue which must be explored further. It will also be necessary to develop details as to the allocation of CI's merchandising and advertising efforts, as between its several products. This will bear not only upon the question of product proximity in the market place, but also upon the level of sophistication of the relevant purchasers, a factor I am commanded to consider. *McGregor-Doniger* at 1137.

I am also commanded by *McGregor-Doniger* to consider the likelihood that CI would "bridge the gap" between the products, that is, the likelihood that CI would enter the women's jeans market under the CARRERA banner. *Ibid.* The affidavits do not speak to this issue.

 In addition, there is no demonstration in the affidavits of actual consumer confusion. While I recognize that the owner of an infringed trademark need not prove actual confusion in order to prevail, *McGregor-Doniger* at 1136 and cases cited, the trial judge may take an absence of actual confusion into consideration in evaluating the likelihood of confusion. *Ibid.* Further inquiry into this area is appropriate.

The foregoing is not intended as an exhaustive recitation of the areas where further factual development is necessary. Counsel should be guided by the Second Circuit's analysis in *McGregor-Doniger.* I am satisfied, however, that it would not be proper to grant CI a preliminary injunction on the basis of the present record. In *McGregor-Doniger,* at 1139, Judge Meskill observed that "in trademark infringement cases involving non-competing goods, it is rare that we are 'overwhelmed by the sudden blinding light of the justness of one party's cause'" (citing *King Research v. Shulton, Inc.,* 454 F.2d 66, 69 (2d Cir. 1972). That observation reflects the interaction of the several factors involved; and serves to explain why the district courts should tread warily in granting preliminary injunctions on the basis of affidavits alone, at least in cases where the defendant suggests plausi-

ble areas for further development of pertinent facts.

CI relies upon *Safeway Stores, supra,* in which the Second Circuit affirmed a preliminary injunction which was granted on the basis of the pleadings and affidavits alone. However, the circumstances in *Safeway Stores* were quite different. Plaintiff had used its registered trademark "Safeway" in respect of its supermarket business, and also, as an adjunct of that business, in its operations in the purchase, sale and leasing of real estate, together with the construction of offices, distribution centers, retail stores, and other facilities. The defendant incorporated itself under the name "Safeway Properties, Inc." and sought to engage in real estate transactions on a nationwide basis, but with emphasis on the New York metropolitan area, one of its chief interests being the construction of shopping centers near airports. All these facts appeared from the affidavits, together with affidavits demonstrating actual confusion on the part of persons who "telephoned the plaintiff in the belief that the defendant and the plaintiff were affiliated." 307 F.2d at 498. Thus the affidavits in *Safeway Stores* demonstrated activities by the parties in the same business, and actual confusion among consumers. These circumstances were held sufficient to justify a preliminary injunction on the basis of the affidavits alone. In the case at bar, the affidavits do not demonstrate competition among directly competing goods or services, and resulting actual confusion; they raise only the possibility of confusion as to the origin of non-competing goods. The sufficiency of the affidavits in *Safeway Stores* does not demonstrate the sufficiency of affidavits in the case at bar. CI also relies upon *Fleischmann Distilling Corp. v. Maier Brewing Company,* 314 F.2d 149 (9th Cir. 1963); but in that case the Court of Appeals reversed the district court, and granted an injunction, only on the basis of a full record of market conditions and related factors, developed at trial.

 In sum, I conclude that the pleadings and affidavits, standing alone, do not

entitle CI to a preliminary injunction;[6] and that CJ is entitled to the discovery prayed for in its cross-motion. Counsel for CI will no doubt wish to consider what discovery they may require from CJ, in order to flesh out the issues posed by this essentially skeletal record.

## IV.

As to procedure, counsel for CJ suggested at oral argument that depositions might take the place of an evidentiary hearing in open court. There is precedent for such a resolution; in *Jacobson & Co. v. Armstrong Cork Co., supra,* at 442, the Second Circuit observed of the record before the district court:

> "Judge Weinfeld had before him not only the pleadings and affidavits of the parties, but also the transcripts of three depositions and a number of exhibits. Where the district court has the benefit of so complete a record, and the parties themselves fail to request a hearing, no evidentiary hearing is required."

My direction, therefore, is that the parties proceed to develop the factual issues by depositions and on an expedited basis. I will rely upon the good faith of counsel to accomplish the necessary depositions and other discovery as quickly as possible. Some consideration must be given to the holiday season. While enjoining the parties to complete discovery at an earlier date if at all possible, I further direct that all discovery be completed not later than January 11, 1980, unless the Court further extends that deadline for good cause shown.

As soon as discovery is completed, the parties are directed so to advise the Court, so that the need for a further evidentiary hearing may be explored.

6. With reference to the *Caulfield* standard, p. 822 *ante*, CI has demonstrated a possibility of consumer confusion as to origin; and that is sufficient to establish the possibility of consequent irreparable injury. Thus the threshold requirement for a preliminary injunction is satisfied. The present motion fails because CI has not demonstrated, on this record, "probable success on the merits" or "sufficiently serious questions going to the merits to make them a

## CONCLUSION

For the foregoing reasons, plaintiff's motion for a preliminary injunction is denied on the present record; defendants' motion to compel discovery is granted; and the case will go forward in conformity with this opinion.

It is So Ordered.

fair ground for litigation and a balance of hardships tipping decidedly" toward CI. Serious merit questions abound; but CJ's plausible depiction of the adverse effect of an injunction upon it, coupled with the lack of precision or immediacy in CI's averments of injury, cf. *Avon Shoe, supra,* at 551, preclude a present finding that the balance of hardships tips decidedly toward CI.